UNION SAVINGS BANK, Appellant,

v.

WHITE FAMILY COMPANIES, INC., et al., Appellees.

[Cite as *Union Sav. Bank v. White Family Cos., Inc.,* 167 Ohio App.3d 51, 2006-Ohio-2629.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 21137.

Decided May 19, 2006.

52

Harry J. Finke IV, for appellant.

Robert B. Berner, Nick V. Cavalieri, and Adam J. Biehl, for appellee White Family Companies, Inc.

Richard A. Talda and Sylvie Derrien, for appellee Nelson D. Wenrick.

WOLFF, Judge.

{¶ 1} Union Savings Bank ("Union") appeals from a judgment of the Montgomery County Court of Common Pleas, which granted the motion of White Family Companies, Inc. ("WFC") for summary judgment and Nelson D. Wenrick's motion to dismiss.

{¶ 2} Union alleged the following facts in its complaint.

{¶ 3} From time to time, Union used Dayton Title Warranty Agency, Inc. ("Dayton Title") as a closing agent in connection with certain residential-mortgage loans, including the refinancing of such loans. At all times, Dayton Title maintained an escrow account at National City Bank ("NCB"). Dayton Title

used that NCB account to escrow and distribute funds in connection with real-estate transactions in which Dayton Title was involved.

{¶ 4} On September 3, 1999, WFC and Wenrick loaned $3.2 million and $1.6 million, respectively, to Invesco, L.L.C. Invesco was owned by two individuals: Krishan Chari and Michael Karaman. The ostensible purpose of Invesco was to engage in real-estate transactions.

{¶ 5} On October 19, 1999, Chari delivered a $5 million check to Dayton Title, and Dayton Title deposited that check in the NCB account. That same day, Dayton Title issued checks from the NCB account to WFC and Wenrick in the amounts of $3.26 million and $1.625 million, respectively, in payment of the September loans. WFC's check from the NCB account cleared on October 20, 1999, and Wenrick's check cleared on October 25, 1999.

{¶ 6} On October 25, 1999, and October 29, 1999, Chari presented two additional $5 million checks for deposit into the NCB account. On October 26, 1999, Chari's original $5 million check was dishonored for insufficient funds. The two subsequent $5 million checks were also later dishonored for insufficient funds. Union alleged that among the funds constituting the $3.26 million and $1.625 million transferred to WFC and Wenrick from the NCB account were $742,848.62 that belonged to third parties, including Union.

{¶ 7} In particular, Union alleged that on October 25, 1999, Dayton Title closed a loan from Union to Doug J. Noll and Amenda L. McGuffin, whereby Noll and McGuffin refinanced their existing residential-mortgage loan from Union with a new residential-mortgage loan from Union. Because the loan was a refinancing of an existing loan, the loan was to be "net funded" with Union providing the difference between the amount of the new loan ($134,194.78) and the payoff of the old loan ($105,866.68). The net-funding amount was therefore $28,328.10.

{¶ 8} Union placed the net-funding amount into an account maintained in Dayton Title's name at Union. Union provided written instructions to Dayton Title according to which Dayton Title was to withdraw the net-funding amount from the Union account. Rather than withdrawing the net-funding amount, however, Dayton Title withdrew $134,194.78 from the Union account, which it deposited into the NCB account. Dayton Title then wrote a check on the NCB account in the amount of $105,866.68 and delivered that check to Union. Union returned that check to Dayton Title with a note that the transaction was to be net funded. Rather than depositing that returned check into the Union account, Dayton Title left the $105,866.68 in the NCB account. Union alleged that the $105,866.68 was part of the funds that were transferred to WFC and Wenrick from the NCB account. Union also asserted that the day of the actual transfer of funds to WFC and Wenrick was "inconsequential." Union referred to the August 11, 2003 decision of the court in Dayton Title's bankruptcy action, which stated, in

part, that a determination of the source and ownership of funds received by WFC and Wenrick could not be determined until November 19, 1999, the day when all activity in the NCB account ceased.

{¶ 9} On October 14, 2003, Union brought suit against WFC and Nelson D. Wenrick asserting claims of conversion, unjust enrichment, constructive trust, fraudulent transfer, and preferential transfer. WFC responded by filing a motion to dismiss, pursuant to Civ.R. 12(B)(6). WFC argued, in essence, that it could not have received Union's funds related to the Noll/McGuffin loan because those funds were deposited into the NCB account after the check to WFC had cleared. Union responded, in part, by asserting that the trial court was bound by the bankruptcy court's decision under the doctrines of res judicata and collateral estoppel. On March 24, 2004, the court granted WFC's motion. On December 10, 2004, Wenrick filed a motion for summary judgment, also asserting that Union could not establish that the money he received was Union's property. On June 10, 2005, the trial court granted Wenrick's motion.

{¶ 10} Union raises two assignments of error on appeal, asserting that the trial court erred in granting Wenrick's and WFC's motions.

{¶ 11} "In order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted (Civ.R.12(B)(6)), it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753, syllabus. "In construing a complaint upon a motion to dismiss for failure to state a claim, we must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the nonmoving party." *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753. Although the factual allegations of the complaint are taken as true, "[u]nsupported conclusions of a complaint are * * * not sufficient to withstand a motion to dismiss." *State ex rel. Hickman v. Capots* (1989), 45 Ohio St.3d 324, 324, 544 N.E.2d 639; see, also, *Garofalo v. Chicago Title Ins. Co.* (1995), 104 Ohio App.3d 95, 104, 661 N.E.2d 218. "A court cannot dismiss a complaint under Civ.R. 12(B)(6) merely because it doubts the plaintiff will prevail." *Leichtman v. WLW Jacor Communications, Inc.* (1994), 92 Ohio App.3d 232, 234, 634 N.E.2d 697.

{¶ 12} Summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *State ex rel. Grady v.*

*State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46. The moving party "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. If the moving party satisfies its initial burden, "the nonmoving party then has a reciprocal burden * * * to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Id.; see Civ.R. 56(E).

{¶ 13} Our review of the trial court's dismissal of Union's claim against WFC, pursuant to Civ.R. 12(B)(6), is de novo. *Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co.* (1994), 93 Ohio App.3d 292, 294, 638 N.E.2d 174. Likewise, we review de novo the trial court's grant of summary judgment in favor of Wenrick. See *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841.

*Conversion, Unjust–Enrichment, and Constructive–Trust Claims*

{¶ 14} We begin with the trial court's dismissal of Union's conversion, unjust-enrichment, and constructive-trust claims against WFC and its grant of summary judgment in favor of Wenrick on those claims. At the heart of the trial court's ruling was the court's conclusion that the timing of the transactions into and from Dayton Title's NCB account was paramount. In so concluding, the trial court rejected Union's assertion that it was bound by the bankruptcy court's determinations on that issue.

{¶ 15} The Dayton Title bankruptcy has generated considerable litigation. At the center of the bankruptcy proceedings has been an analysis of whether funds transferred to WFC and Wenrick represented property of Dayton Title's bankruptcy estate. On April 25, 2003, the bankruptcy court addressed whether the money transferred to WFC and Wenrick from Dayton Title's trust account was money held in express trust for others or was Dayton Title's property. See *Dayton Title Agency, Inc. v. White Family Cos.* (Bankr.S.D.Ohio 2003), 292 B.R. 857. Addressing WFC's, Wenrick's, and Dayton Title's motions for summary judgment, the court concluded that NCB's provisional loan of $4,142,151.38 to Dayton Title (i.e., the checking account overdraft ultimately caused by the payment of the checks to WFC and Wenrick) was property of the estate and that Dayton Title had the power to recover those assets as fraudulent transfers. Id. at 872. It was undisputed that $722,101.49 of the $742,848.62 that existed in the trust account at the time of the transfers to WFC and Wenrick were third-party

funds held by Dayton Title in trust. Id. at 869–870. Because these funds were held in trust, Dayton Title lacked the authority to recover those funds as fraudulent transfers. The court found that a genuine issue of material fact existed as to the ownership of $20,747.13 that existed in the account at the time of the transfer to WFC and Wenrick.

{¶ 16} As to the funds held in trust, the bankruptcy court noted that "the more than thirty (30) third party beneficiaries, who are claimants in Dayton Title's bankruptcy, are not without remedy. As noted in [*Stevenson v. J.C. Bradford & Co. (In re Cannon)* (C.A.6 2002), 277 F.3d 838], the beneficiaries of funds held in an escrow account may pursue their own cause of action against Defendants WFC and Wenrick in state court. 277 F.3d at 856. Although the overall effect of requiring these thirty (30) or more beneficiaries to pursue their own causes of action in state court creates a multiplicity of suits, this result is necessitated by Cannon and the limits of the bankruptcy court's authority." *Dayton Title Agency,* 292 B.R. at 870, fn. 5.

{¶ 17} Although the April 25 decision referred to the $742,848.62 as funds "existing in the trust account at the time of the transfers to Defendants WFC and Wenrick," id. at 870–871, the court did not elaborate at that time on how that number was ascertained. The court subsequently stated that "[t]he $742,848.62 represents the amount of funds dissipated by the final debiting of the account on or about November 19, 1999, which is after National City froze the account, but continued to allow funds to be deposited." *Dayton Title Agency, Inc. v. White Family Cos.* (Bankr.S.D.Ohio Aug. 11, 2003), No. 99–35768, fn. 1. The deficit of $4,142,151.38 was the final balance, as of November 19, 1999, when all activity in the NCB account halted. Id. at 4. Thus, the bankruptcy court implicitly determined that the $742,848.62 that existed in Dayton Title's NCB trust account at the time of the final debiting on November 19, 1999, was transferred to WFC and Wenrick even though WFC's and Wenrick's checks had previously been honored.

{¶ 18} Subsequent to the April 25 decision, the bankruptcy court held a trial on the ownership of the $20,747.13 that remained in dispute. In the course of that trial, Dayton Title presented a spreadsheet created on November 3, 1999, which showed a list of the amounts owed to payees as of that date. See *Dayton Title Agency, Inc. v. White Family Cos.* (Bankr.S.D.Ohio Aug. 11, 2003), No. 99–35768. Based on testimony presented, the court found that the evidence at trial indicated that the fees owed to Dayton Title as of November 3, 1999, were likely earned from closings that occurred after the clearing of the checks to WFC and Wenrick. WFC and Wenrick thus argued that the $4,885,000 in proceeds that they received on or about October 19, 1999, could not have included fees earned by Dayton Title after that date. Id.

{¶ 19} On August 11, 2005, the bankruptcy court found that Dayton Title had proven a recoverable interest in the disputed money. In so ruling, the court rejected WFC's and Wenrick's assertion that the $4,885,000 they received could not include funds submitted to the NCB account after their checks had been honored. The court stated:

{¶ 20} "[WFC and Wenrick's] argument fails to take into consideration that the October transfers to WFC and Wenrick did not immediately impact the escrow account because of the inflated artificial balance created by Chari's fraudulent checks. Looking at the account on the date of the $4,885,000.00 transfers to WFC and Wenrick or the date their checks cleared on October 20 and 25, 1999, the account appeared to have sufficient funds to cover the transfers because the account included a $5,000,000.00 credit for at least one of Chari's fraudulent checks. Consequently, the October 1999 bank statement for the account gives the impression that WFC and Wenrick were properly paid from Chari's funds. However, even the Defendants acknowledge that Chari's funds are not what they actually received. Instead, their $4,885,000.00 transfers consumed the remaining funds in the escrow account and produced a large deficit upon the final dishonoring of Chari's checks in November of 1999, long after the actual transfer date. The transfers to WFC and Wenrick from the escrow account did not dissipate the remaining $742,848.62 in the escrow account until Chari's last $5,000,000.00 check was dishonored.

{¶ 21} "Although it may seem illogical, the source and ownership of the funds received by Defendants cannot be determined until the day the 'dust settled' on November 19, 1999, after the account was debited for Chari's final dishonored check and all activity in the escrow account ceased. Because of the transfer's delayed impact on the escrow account, the date of the actual transfer to WFC and Wenrick is inconsequential and Dayton Title may recover funds from WFC and Wenrick even if they were earned after October 19, 1999."

{¶ 22} In granting WFC's motion to dismiss, the trial court herein concluded that it was not bound to accept the bankruptcy court's determinations under the doctrine of collateral estoppel. The court reasoned:

{¶ 23} "After carefully reviewing the Bankruptcy Court's decision, this Court finds it narrowly focused on whether certain transfers made to WFC and Wenrick by Dayton Title could be avoided on the basis [of] trust law addressing commingling funds belonging to a trustee. The Bankruptcy Court did not 'actually and directly litigate' whether WFC received any of Union's funds. Its findings relating to Dayton Title's attempt to avoid the transfers to WFC and Wenrick is not sufficiently similar to the issues presented here by Union to permit this court to conclude that WFC 'clearly has had its day in court on the specific issue brought into litigation within the later proceeding.' *Goodson* [*v.*

*McDonough Power Equip., Inc.* (1983) ], 2 Ohio St.3d [193], at 200–201, 2 OBR 732, 443 N.E.2d 978. As such, the Court finds that collateral estoppel is not applicable and this Court is not bound to the finding of the Bankruptcy Court that the 'date of the actual transfer to WFC and Wenrick is inconsequential' to Union's claims.

{¶ 24} "To the contrary, for the purposes of assessing whether Union has stated a claim for relief under the common law tort of conversion, the date of the actual transfer of funds from the NCB Escrow Account to WFC and Wenrick is of the highest consequence. Because it is undisputed that such transfer occurred five days prior to Union placing its funds in the NCB Escrow Account, the Court must find that Union, by its own averment, cannot establish the factual threshold to assert a claim for conversion: that the funds WFC received were Union's property."

{¶ 25} The trial court likewise dismissed Union's unjust-enrichment and constructive-claims on the ground that Union could not establish that WFC had received funds belonging to Union. In granting summary judgment to Wenrick, the court adopted its prior finding that it was not bound by the bankruptcy court's ruling. Because it was undisputed that the transfer to Wenrick occurred five days prior to Union's funds being placed in the NCB account, the court again found that Union could not establish that Wenrick received funds belonging Union.

{¶ 26} At the outset, we agree with the trial court that Union's claims for conversion, unjust enrichment, and constructive trust require that Union demonstrate that WFC and Wenrick possess funds that rightfully belong to Union. Conversion is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another. *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172, 175. "The constructive trust doctrine is an equitable remedy which permits a court to order a person who owns the legal title to property to hold or use the property for the benefit of another or to convey the property to another to avoid an unjust enrichment." *In re Bucholtz* (Apr. 24, 1998), Greene App. No. 97–CA–0079, 1998 WL 214597, citing *Gabel v. Richley* (1995), 101 Ohio App.3d 356, 655 N.E.2d 773. Unjust enrichment occurs when a person has and retains money or benefits that in justice and equity belong to another. *Hummel v. Hummel* (1938), 133 Ohio St. 520, 11 O.O. 221, 14 N.E.2d 923.

{¶ 27} On appeal, Union asserts that the trial court erred when it failed to apply the doctrine of collateral estoppel to the issue of whether funds deposited subsequent to October 25—such as the Noll/McGuffin funds—were paid to Wenrick and WFC. Although Union acknowledges that it was not a party to the adversary proceeding in the bankruptcy court, it claims that mutuality of the

parties is not required for collateral estoppel under Ohio law and, further, that WFC and Wenrick actually litigated the issue of whether funds deposited into the NCB account after the date of the transfers to them could nevertheless be considered part of the monies that they received.

{¶ 28} In our judgment, the trial court took an unreasonably narrow view of the bankruptcy court rulings. Although the bankruptcy court's August 11, 2005 holding resolved whether Dayton Title had a recoverable interest in the disputed $20,747.13, a critical issue in that determination was whether funds deposited after the honoring of the checks to WFC and Wenrick were used to pay for those checks. This issue was likewise addressed in the bankruptcy court's prior April 25 decision. Accordingly, we agree with Union that WFC and Wenrick actually litigated during the adversary proceeding the general issue of whether funds deposited subsequent to October 25 were paid to Wenrick and WFC.

{¶ 29} We need not determine, however, whether the trial court erred when it concluded that it was not bound by the bankruptcy court's decision under collateral estoppel principles. Even if collateral estoppel does not apply, we agree with the bankruptcy court's approach to determining whether WFC and Wenrick could have received funds that were deposited into the NCB account after their checks had cleared.

{¶ 30} Although not couched in these terms, the crux of the trial court's decision was that the only proper method of tracing funds in the NCB account was by viewing the transactions chronologically. This approach, while elegant in its simplicity, ignores the reality of the banking transactions at issue. As stated in *In re Frigitemp Corp.* (S.D.N.Y.1983), 34 B.R. 1000:

{¶ 31} "The UCC [Uniform Commercial Code] sanctions grants of provisional credit by depositary banks, *see* UCC 4–201, 4–212, and the practice is a common means of facilitating the speedy utilization of funds in commerce, while the collection process is underway. Banks ultimately collect virtually all checks for which provisional credit is granted. UCC 4–212, Official Comment 1. The collection process works on the theory that 'no news is good news,' and the depositary, collecting, and Federal Reserve banks each in turn grant provisional credits. *See* E. Farnsworth & J. Honnold, *Cases and Materials on Commercial Law* 136–57 (1976). These become final without any further entry if the drawee bank has not dishonored the check within a set, statutory period. *See* UCC 4–213 and Comments." Id. at 1015.

{¶ 32} If the check is dishonored within the prescribed period, the collecting bank may charge back the amount of any credit given for the item to its customer's account. See R.C. 1304.24, which is the Ohio codification of UCC 4–214.

{¶ 33} As described by Union in its complaint, Chari deposited $5 million into the NCB account. Under usual banking practices, Dayton Title's account balance would reflect a provisional credit of $5 million. When this initial check was dishonored, NCB charged back the amount of the provisional credit. Due to Chari's subsequent deposits of two additional $5 million checks, however, the account balance of the NCB account did not reflect an overdraft until all activity in the account ceased.

{¶ 34} Construing Union's complaint in its favor, the $5 million dollar check deposited on October 19, 1999, was ostensibly the source of funding for the two checks from the NCB account to WFC and Wenrick in the amounts of $3.26 million and $1.625 million, respectively. Union alleged that WFC's check cleared on October 20, 1999, and Wenrick's check cleared on October 25, 1999. Because Chari's $5 million checks were dishonored, it is unquestionable that the source of WFC's and Wenrick's payments could not have come from Chari. When all account activity ceased, the account balance reflected an approximately $4.1 million overdraft caused by the payment of the checks to WFC and Wenrick.

{¶ 35} In our view, the allegations support the conclusion that the funds belonging to the third parties, such as Union, who deposited funds in the NCB account after the honoring of the checks to WFC and Wenrick were subsumed by the charge back upon the ultimate dishonoring of all of Chari's $5 million checks. Although placed in the account after the honoring of the checks to WFC and Wenrick, these third-party funds necessarily were used to pay for the overdraft caused by the honoring of those checks. In other words, the third-party funds became a source of the funding of the checks to WFC and Wenrick, even though the monies were deposited into the account after the checks were honored.

{¶ 36} Accordingly, we conclude that the trial court inappropriately relied upon the chronology of the transactions into and from the NCB account. Because the trial court granted the motion to dismiss and the motion for summary judgment regarding the claims of conversion, unjust enrichment, and constructive trust on the ground that Union's funds were deposited subsequent to the honoring of WFC's and Wenrick's checks, we find those rulings to be erroneous. In our view, the trial court should have taken a more holistic view of account activity, as done by the bankruptcy court, and concluded that Union's funds were a source of the funds for WFC's and Wenrick's checks despite the fact that they were deposited into the account after those checks were honored.

*Fraudulent Transfer and Preferential Transfer Claims*

{¶ 37} In count four of its complaint, Union alleged that it was entitled to avoid the transfers from the NCB account to WFC and Wenrick as fraudulent transfers, pursuant to the Ohio Uniform Transfer Act, R.C. Chapter 1336. The

trial court dismissed Union's fraudulent-transfer claim against WFC on the ground that Dayton Title did not have an interest in the $105,866.68 and, thus, the money was not an asset that could be the subject of a fraudulent transfer. The court granted summary judgment to Wenrick on the same basis. We agree.

{¶ 38} Under R.C. 1336.04(A), a transfer that is made by a debtor is fraudulent as to a creditor if the transfer was made (1) with actual intent to hinder, delay, or defraud any creditor of the debtor, or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation and if other conditions exist. A creditor may avoid a fraudulent transfer to the extent necessary to satisfy its claim. R.C. 1336.07(A)(1).

{¶ 39} R.C. 1336.01(L) defines a transfer as "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." The term "asset" is generally defined as "property of a debtor." R.C. 1336.01(B).

{¶ 40} Here, Union has sought to avoid the transfer by Dayton Title from its NCB account to Wenrick and WFC. In its complaint, Union alleged that the $105,866.68 from the Noll/McGuffin loan was held by Dayton Title in trust. Union likewise argued in its response to Wenrick's motion for summary judgment that these funds were held in trust for Union. As noted by the trial court, the Sixth Circuit has held that funds deposited into a debtor's escrow account in express trust for others are not part of the debtor's bankruptcy estate and, thus, "they are not 'an interest of the debtor in property.'" *In re Cannon*, 277 F.3d at 852. Because Dayton Title had no interest in the money it held in trust for Union, those funds were not "assets" of Dayton Title. Accordingly, the trial court properly concluded that Union could not, as a matter of law, avoid the transfer of the $105,866.68 as a fraudulent transfer under R.C. Chapter 1336.

{¶ 41} Count five of Union's complaint alleged that the transfers to Wenrick and WFC were preferential transfers under the Ohio Preference Statutes, R.C. 1313.56 and 1313.57. R.C. 1313.56 provides that conveyances made in an attempt to defeat or hinder creditors may be voided by the creditor and allows the appointment of a receiver. *Danis v. Great Am. Ins. Co.*, 159 Ohio App.3d 119, 132–33, 2004-Ohio-6222, 823 N.E.2d 59. R.C. 1313.57 creates an exception if the party to whom the property has been conveyed was unaware of the debtor's fraudulent intent. Id.

{¶ 42} Although R.C. Chapter 1313 does not define the terms "transfer" or "assets," we agree with the trial court that the Ohio Preference Statute applies only to the conveyance of an asset of the debtor. The purpose of the Ohio Preference Statute is to prohibit a debtor from giving preferential treatment to

one creditor over others. It is undisputed that the $105,866.68 was held by Dayton Title (the debtor) in its NCB escrow account in trust for Union. Because those funds were not assets of Dayton Title, Dayton Title could not convey those funds to Wenrick and WFC as preferential transfers. Accordingly, the trial court properly dismissed Union's preferential-transfer claim against WFC and properly granted summary judgment on that claim in favor of Wenrick.

{¶ 43} In sum, the trial court erred in concluding that Union had failed to state claims of conversion, unjust enrichment, and constructive trust against WFC, and in granting summary judgment to Wenrick on those claims. The trial court properly dismissed Union's fraudulent-transfer and preferential-transfer claims against WFC and in granting summary judgment to Wenrick on those claims.

{¶ 44} As a final matter, the parties indicate that Dayton Title had an errors-and-omissions policy with Philadelphia Indemnity Insurance Company, and that Dayton Title made a claim under the policy to recover funds belonging to third parties, including Union. WFC and Wenrick have filed copies of orders from the bankruptcy court that indicate that Union has been compensated in full for its losses through distributions from the Dayton Title insurance escrow in the bankruptcy court. We note that the bankruptcy court's most recent order of April 25, 2006, indicates that this last distribution "shall be in full and complete satisfaction, release, and discharge of the escrow claims of said eight distributees [which included Union] against the Insurance Escrow, * * * but shall not be a release or waiver of claims that they may have against Debtor's other assets or any third party, and in particular, The White Family Companies, Inc. and/or Nelson D. Wenrick. Debtor and any third party may raise any claims and/or defenses that they may have to any such claim." Based on the language of the order, we fail to see how Union's receipt of these distributions affects the outcome of this lawsuit.

{¶ 45} The first and second assignments of error are overruled in part and sustained in part.

{¶ 46} The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BROGAN and FAIN, JJ., concur.