DICE et al., Appellees and Cross-appellants,

v.

WHITE FAMILY COMPANIES, INC., Appellants and Cross-appellees.

[Cite as Dice v. White Family Cos., 173 Ohio App.3d 472, 2007-Ohio-5755.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 22057 and 22060.

Decided Oct. 26, 2007.

See also, 2005 WL 1364987.

Dwight D. Brannon and Matthew C. Schultz, for appellees and cross-appellants.

Paul H. Shaneyfelt, for appellant and cross-appellee White Family Companies, Inc.

Douglas W. Geyer and David D. Herier, for appellant and cross-appellee Nelson D. Wenrick.

WOLFF, Presiding Judge.

{¶ 1} White Family Companies, Inc. ("WFC") and Nelson D. Wenrick appeal from a judgment of the Montgomery County Court of Common Pleas, which granted summary judgment in favor of Janice E. Dice and Eugene Collins on their unjust-enrichment and constructive-trust claim and awarded prejudgment interest beginning on October 20, 1999. Dice and Collins cross-appeal, claiming that the trial court erred in granting summary judgment in favor of WFC and Wenrick on their conversion claim and in offsetting their damages by the amount they received from a third party's insurer.

{¶ 2} The facts underlying this matter are largely undisputed.

{¶ 3} Krishan Chari and Michael Karaman were partners in a business entity known as Invesco, L.L.C. Wenrick apparently knew of Karaman's involvement with Invesco, but not of Chari's involvement. The ostensible purpose of Invesco was to engage in real-estate transactions.

{¶ 4} On several occasions in 1999, WFC and Wenrick each made short-term bridge loans to Invesco. When lending money to Invesco, WFC and Wenrick

either wrote checks or wired money to Dayton Title Agency, Inc. ("DTA"). National City Bank ("NCB") was the depository of monies held by Dayton Title in an escrow account.

{¶ 5} On September 3, 1999, WFC and Wenrick separately made bridge loans, totaling $4.8 million, to Invesco. Wenrick's loan in the amount of $1.6 million was to finance the purchase of a Staples location. Wenrick made the $1.6 million loan to Invesco by wiring funds to Dayton Title's Interest on Trust Account ("IOTA") escrow account at National City. In return, he received a promissory note executed by Karaman personally and on behalf of Invesco. WFC's loan in the amount of $3.2 million concerned Invesco's purchase of real estate located at 9550 Montgomery Road in Warren County. WFC received a promissory note and a personal guaranty by Karaman in return.

{¶ 6} The loans to Invesco became due on or before October 3, 1999. Soon after the loans were past due, WFC and Wenrick received checks from Chari drawn on a Texas Interest on Lawyers' Trust Account ("IOLTA") of John Lewis. The Texas checks were returned for insufficient funds. Wenrick stated in his deposition that he talked with Karaman after the Texas check bounced. Karaman told Wenrick that he would get Wenrick the money, that Wenrick did not have to worry, and that he would be repaid by Karaman personally.

{¶ 7} On October 19, 1999, Chari delivered a forged $5 million check to Dayton Title. Dayton Title deposited the check and directed National City to issue two checks drawn on the escrow account on the provisional credit of the forged check. Those two checks, totaling $4.885 million, were issued to WFC and Wenrick to repay the September loans. On the same day, Karaman delivered a $1.625 million check to Wenrick, who deposited the check at his bank that night. Wenrick used the money to repay a $1.1 million loan from his line of credit at Security National Bank.

{¶ 8} On October 20, 1999, Karaman met Timothy White, President of WFC, at the downtown branch of National City Bank. Karaman gave White a check for $3.26 million drawn on the Dayton Title escrow account. White presented that check to a teller at National City and requested a bank check for $3.26 million, which he received.

{¶ 9} WFC's check from Dayton Title's account cleared on October 20, 1999. Wenrick's check cleared on October 25, 1999.

{¶ 10} Shortly after National City had issued and honored the two Dayton Title checks, it learned that the check deposited by Dayton Title, i.e., Chari's check, had been forged. By that time, Dayton Title's escrow account had been drained of funds. The account had contained funds owed by Dayton Title to Collins, Dice, and others from their respective real-estate closings. At the time the account

was closed, Dice had been issued a check drawn on the escrow account in the amount of $108,626.72 that remained unsatisfied, and Collins was owed $50,046.43 from the account. Dayton Title was forced to file bankruptcy.

{¶ 11} Dice, Collins, and a number of other individuals or entities that had suffered similar losses were unable to recover on their claims in the bankruptcy proceeding. On July 16, 2003, Dice and another individual initiated the instant litigation against WFC and National City. In the most recent amended complaint, filed on January 20, 2006, Dice and Collins have brought suit against WFC and Wenrick, alleging conversion, tortious interference with business relations, fraudulent transfer, constructive trust, unjust enrichment, and breach of fiduciary duty.

{¶ 12} On August 1, 2006, WFC and Wenrick filed a motion for summary judgment on all of Dice and Collins's claims. On the same day, Dice and Collins filed a motion for partial summary judgment on their claims for conversion and fraudulent transfer. On November 27, 2006, the trial court overruled the plaintiffs' motion for partial summary judgment and overruled in part and sustained in part WFC and Wenrick's motion. The trial court granted summary judgment to WFC and Wenrick on the conversion, tortious-interference-with-business-relations, breach-of-fiduciary-duty, and fraudulent-transfer claims. The court further indicated that the collateral-source rule did not apply, and thus, WFC and Wenrick would be entitled to a setoff of any insurance payments that Dice and Collins had received under Dayton Title's errors-and-omissions insurance policy. The court denied summary judgment to WFC and Wenrick on the constructive-trust and unjust-enrichment claim. The court noted that Dice and Collins had not moved for summary judgment on that claim.

{¶ 13} On December 11, 2006, Dice and Collins filed a motion for partial summary judgment on their unjust-enrichment claim. The trial court granted the motion on February 2, 2007. The court awarded damages to Dice in the amount of $54,315.94 and to Collins in the amount of $25,024.93, representing prejudgment interest from October 20, 1999, to May 8, 2006. The principal losses incurred by Dice and Collins had been repaid from Dayton Title's insurance escrow account as part of Dayton Title's bankruptcy case.

{¶ 14} WFC and Wenrick appeal, claiming that the trial court erred in granting summary judgment in favor of Dice and Collins on the unjust-enrichment and constructive-trust claim and in awarding prejudgment interest from October 20, 1999. Dice and Collins cross-appeal, claiming that the trial court erred in denying them summary judgment on their conversion claim and on the issue of a setoff of damages. Dice and Collins have not appealed the trial court's ruling on their fraudulent-preference, tortious-interference-with-business-relations, and breach-of-fiduciary-duty claims. We will begin with a discussion of Dice's and

Collins's conversion and unjust-enrichment and constructive-trust claims, and then turn to the issues of prejudgment interest and damages.

{¶ 15} Our review of the trial court's decision to grant summary judgment is de novo. See *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 65–66, 8 O.O.3d 73, 375 N.E.2d 46.

### A. *Conversion claim*

{¶ 16} In their cross-appeal, Dice and Collins claim that the trial court erred in granting summary judgment to WFC and Wenrick on their claim for conversion.

{¶ 17} Conversion is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another. *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172; *Union Sav. Bank v. White Family Cos., Inc.*, 167 Ohio App.3d 51, 2006-Ohio-2629, 853 N.E.2d 1182, ¶ 26. Typically, "[t]he elements of a conversion cause of action are (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Haul Transport of VA, Inc. v. Morgan* (June 2, 1995), Montgomery App. No. 14859, 1995 WL 328995; see *Knoop v. Knoop*, Montgomery App. No. 22037, 2007-Ohio-5178, 2007 WL 2821508, ¶ 20. Where conversion is premised on the unlawful retention of property, the plaintiff must establish that "(1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to deliver the property to its rightful owner." *Barnes v. First Am. Title Ins. Co.* (Aug. 8, 2006), N.D.Ohio No. 1:06CV574, 2006 WL 2265553, citing *Tabar v. Charlie's Towing Serv., Inc.* (1994), 97 Ohio App.3d 423, 427–28, 646 N.E.2d 1132. Where an action for conversion is based on the conversion of cash, the action will "only lie if 'identification is possible and there is an obligation to deliver the specific money in question.'" *Haul*, supra.

{¶ 18} In granting summary judgment to WFC and Wenrick on the conversion claim, the trial court did not determine whether Dice and Collins's funds were sufficiently identified. Instead, it stated that, even assuming that the funds were

"earmarked," "there is no evidence that a relationship existed between Defendants and Plaintiffs which obligated Defendants to deliver the specific money in question." The court noted that WFC and Wenrick had received the money from the Dayton Title account as repayment of a debt and "[u]nless and until ordered by a court, Defendants were under no legal obligation to repay the Plaintiffs." The court further found no evidence that WFC and Wenrick's acceptance of the checks was wrongful. Relying upon *Hinkle v. Cornwell Quality Tool Co.* (1987), 40 Ohio App.3d 162, 532 N.E.2d 772, the trial court indicated that WFC and Wenrick could not be liable for conversion because they had received the checks as repayment of an antecedent debt and without knowledge that they were drawn from funds held in trust for Collins and Dice.

{¶ 19} Dice and Collins argue that the trial court erred in requiring them to prove that the money was earmarked. They claim that they were simply required to prove that the funds were placed in Dayton Title's escrow account, that the funds were transferred to WFC and Wenrick, and that WFC and Wenrick acquired knowledge that the funds had been held in trust; Dice and Collins claim that the evidence supports each of these elements. Dice and Collins rely, in part, on *United States v. NBD Bank, N.A.* (E.D.Mich.1996), 922 F.Supp. 1235, to support their assertion that funds transferred to a third party in payment of an antecedent debt can be recovered by the trust beneficiary under a conversion theory when the transferee has knowledge that the debt is paid from a trust account. WFC and Wenrick respond that the trial court properly granted summary judgment on the conversion claim because the money at issue was not earmarked.

{¶ 20} In *NBD Bank*, Fidelity Guarantee Mortgage Corporation had issued mortgages under the federal government's mortgage-backed securities program. Fidelity had legal title to the mortgages and serviced them, but equitable title was held by the Government National Mortgage Association ("GNMA"), which guaranteed the mortgages. As part of the program, separate escrow accounts existed for principle and interest ("P & I") payments and for tax and insurance ("T & I") payments. Fidelity had escrow accounts, as well as its corporate accounts, at NBD Bank. NBD made significant loans to Fidelity. In 1992, Fidelity's president withdrew by check $225,000 from the T & I escrow account and deposited the money in Fidelity's corporate accounts. Fidelity then made payments to NBD on its indebtedness. Fidelity subsequently filed for bankruptcy, and GNMA sued NBD to recover the T & I funds, asserting constructive trust, conversion, and breach of contract.

{¶ 21} The federal district court granted summary judgment to GNMA on its constructive-trust, conversion, and breach-of-contract claims with respect to approximately $64,000 of the misdirected trust funds. With regard to the

constructive-trust claim, the court found that GNMA adequately traced approximately $64,000 of the funds to NBD. Because trust and personal funds were commingled, the court employed the intermediate balance rule. It further found that GNMA had a greater equitable rights to the funds. The court stated:

{¶ 22} "NBD knew that the T & I account held money in trust. Further, NBD knew that money had been transferred from the T & I account to Fidelity's operating account. * * * NBD is liable because it *accepted* funds from the operating account after T & I funds had been placed in that account. This court holds that when NBD accepted funds from the operating account in satisfaction of Fidelity's debt to NBD, NBD took the risk that those funds were actually misdirected trust funds from the T & I account. NBD cannot now assert an equitable right to those funds paramount to that of the beneficiary of the constructive trust created by the misdirection of the funds. In short, NBD must return the trust money traced to it." *NBD Bank*, 922 F.Supp. at 1245.

{¶ 23} The court also granted summary judgment in the amount of $64,033.52 on the conversion claim. The court noted that the T & I funds could be converted and that GNMA had the greater equitable title to the money. The trial court rejected the bank's contention that the Michigan version of the UCC applied to the circumstances before it.

{¶ 24} *NBD Bank* is distinguishable from the case before us. *NBD Bank* involved the fiduciary's removal of escrow funds from an escrow account and the placement of those funds in an operating account, from which the funds were used to pay the fiduciary's personal debt. Here, there was no commingling of personal and escrow funds, nor did Dayton Title take Dice's and Collins's funds for its own use. Although *NBD Bank* supports the contention that conversion and unjust-enrichment claims may exist under certain circumstances, it is not relevant to this case.

{¶ 25} The trial court relied upon *Hinkle*, which concluded that Cornwell Quality Tool Company could not recover embezzled funds under a conversion theory. Therein, Cornwell's employee embezzled funds from Cornwell to pay back a former employer, Akron Novelty, for funds that she had previously embezzled from Akron. On appeal, the Ninth District concluded that Akron Novelty should have been granted judgment on the conversion claim, stating:

{¶ 26} "Reasonable minds could not differ as to the bona fide nature of Akron Novelty's conduct in accepting the checks. [Akron Novelty] received the two instruments without any notice that the funds were embezzled. The funds were received as payment for an antecedent debt. There is absolutely no evidence in the record before, during, or after the trial which would negate Akron Novelty's bona fide status." The *Hinkle* court concluded that Akron was a holder in due course.

{¶ 27} Although the trial court did not indicate that it was relying on the Uniform Commercial Code ("UCC"), it followed the UCC doctrine of a holder in due course when it followed *Hinkle.* Under UCC 3–302, a holder becomes a holder in due course if the holder takes the instrument (1) for value, (2) in good faith, (3) and without notice of any claims or defenses otherwise available to the person obligated on the instrument or of various defects in the instrument. R.C. 1303.32(A)(2).

■■ {¶ 28} The UCC's allocations of loss are, at times, inconsistent with the common law of conversion. To state a claim for conversion, the plaintiff need not demonstrate that the defendant acted in bad faith. "[N]either motive nor mistake is a defense to a claim of conversion." *Busch v. Premier Integrated Med. Assoc., Ltd.,* Montgomery App. No. 19364, 2003-Ohio-4709, 2003 WL 22060392, ¶ 98; see, also, *DeLorean Cadillac, Inc. v. Weaver* (Oct. 2, 1997), Cuyahoga App. No. 71827, 1997 WL 607533 ("It is not necessary to demonstrate intent or wrongful purpose by the defendant. * * * Mistake or good faith is not a defense to conversion"). In contrast, under UCC 3–305, a holder in due course takes checks free from all claims to them and all defenses of any party to the instruments with whom the holder has not dealt, with some exceptions. See R.C. 1303.35. Thus, while good faith would not be a defense to a conversion claim, a defendant who qualifies as a holder in due course could be exempt from liability.

{¶ 29} In *Olympic Title Ins. Co. v. Fifth Third Bank of W. Ohio,* Montgomery App. No. 20145, 2004-Ohio-4795, 2004 WL 2009285, we held that the plaintiff's conversion claim was precluded because the matter was governed by the UCC. Although we noted that the UCC did not completely supplant the common law, we stated that parties may not "rely on a common law action to avoid the clear mandates of the UCC." Id. at ¶ 31, quoting *Amzee Corp. v. Comerica Bank–Midwest,* Franklin App. No. 01AP–465, 2002-Ohio-3084, 2002 WL 1012998, ¶ 10. We concluded that "the UCC provides the exclusive remedy where the dispute is governed by its statutory provisions. Common law causes of action may not be raised to circumvent the UCC's rights, claims, and defenses where the statute applies." *Olympic Title* at ¶ 31; see, also *Natl. City Bank v. Citizens Natl. Bank of Southwest Ohio,* Montgomery App. No. 20323, 2004-Ohio-6060, 2004 WL 2588182, ¶ 30.

■ {¶ 30} Upon review of the record in this case, we conclude that WFC and Wenrick were holders in due course. The checks that WFC and Wenrick received were valid on their face. There are no allegations that the instruments were forged or altered. Although Dice and Collins suggest that WFC and Wenrick were suspicious about whether their October 1999 repayment checks would be honored, there is no evidence that WFC and Wenrick engaged in wrongful conduct. They were merely receiving repayment for their loans, which

was overdue and which they were legally entitled to receive. Chari engaged in misconduct, not WFC and Wenrick. Although Wenrick and White both immediately deposited their checks after receiving the Dayton Title checks from Karaman, we do not believe that merely depositing a check upon receipt is evidence of a lack of good faith. Even accepting Dice's and Collins's contention that WFC and Wenrick should have known that Dayton Title's account contained money belonging to other third-parties, there is no evidence that WFC and Wenrick knew when they received the checks that Invesco had not properly deposited funds to support the repayment checks.

{¶ 31} At oral argument, Dice and Collins asserted that the recipient of a check from an escrow account can never be a holder in due course. They cited R.C. 1303.37(B)(4), which states:

{¶ 32} "If an instrument is issued by the represented person [beneficiary] or by the fiduciary of the represented person to the taker as payee, the taker has notice of the breach of fiduciary duty if any of the following apply:

{¶ 33} "(a) The instrument is taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary.

{¶ 34} "(b) The instrument is taken in a transaction known by the taker to be for the personal benefit of the fiduciary.

{¶ 35} "(c) The instrument is deposited to an account other than an account of the fiduciary as fiduciary for the represented person or an account of the represented person."

{¶ 36} None of the circumstances described in R.C. 1303.37(B)(4) exist in this case. Dayton Title did not issue the checks to WFC and Wenrick to pay a debt of Dayton Title or for Dayton Title's benefit. Rather, the checks were issued to pay Invesco's debts to WFC and Wenrick related to the September 3 loans. Moreover, WFC and Wenrick clearly accepted the checks as "represented persons." The evidence demonstrates that WFC had repeatedly conducted its real-estate loans to Invesco through Dayton Title and had received repayment from the Dayton Title account. Wenrick had also wired loan money into the Dayton Title account and had received repayment from Invesco through Dayton Title. Accordingly, WFC and Wenrick's receipt of funds from Dayton Title did not create notice of a breach of fiduciary duty under R.C. 1303.37 or indicate a lack of good faith under R.C. 1303.32.

{¶ 37} We find no authority to support Dice's and Collins's assertion that the payee of an instrument drawn on a fiduciary account can never be a holder in due course.

{¶ 38} Accordingly, we find no genuine issue of material fact as to whether WFC and Wenrick were holders in due course. Thus, the trial court did not err in granting summary judgment to WFC and Wenrick on their conversion claim.

B. *Unjust Enrichment and Constructive Trust*

{¶ 39} Wenrick and WFC assert that the trial court erred in granting summary judgment to Dice and Collins on their unjust-enrichment and constructive-trust claim.

{¶ 40} In its February 2007 judgment, the trial court adopted its reasoning in its November 27, 2006 order as the basis for granting summary judgment to Collins and Dice on their constructive-trust and unjust-enrichment claim. The court stated on November 27, 2006:

{¶ 41} "A constructive trust is an equitable remedy that protects against unjust enrichment. *Estate of Cowling v. Estate of Cowling,* 109 Ohio St.3d 276, 281, 2006-Ohio-2418, 847 N.E.2d 405. A constructive trust may be imposed when it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud. Id.

{¶ 42} "Plaintiffs argue that it is inequitable for Defendants, who knowingly took a business risk in dealing with Chari and Karaman, to not suffer a loss, while Plaintiffs, who did not take such a risk, suffer a loss. Plaintiffs' arguments are well taken in that the Court believes the following principle of equity applies: where one of two innocent persons must suffer by the fraud of a third person, he who trusted the third person and was instrumental in producing the condition that caused the loss must suffer the loss. *Miller v. Albright* (1899), 60 Ohio St. 48, 53 N.E. 490; *Hillside Dairy Co. v. Cleveland Trust Co.* (1944), 142 Ohio St. 507, 27 O.O. 435, 53 N.E.2d 499; *Edgar v. Haines* (1923), 109 Ohio St. 159, 141 N.E. 837.

{¶ 43} "In the present case, Defendants loaned Invesco a large sum of money for purported real estate transactions. However, when Chari repaid Defendants through a forged check drawn on a non-existent account, it was Plaintiffs, the beneficiaries of funds held in DTA's escrow account, who suffered the loss. Despite the fact the Defendants are not liable for the other legal claims of the Plaintiffs, Defendants, who trust Chari and Karaman and loaned them money, should suffer the loss to the extent to which the Plaintiffs have not been fully reimbursed. The Court hereby *Overrules* Defendants' Motion for Summary Judgment regarding constructive trust and unjust enrichment."

{¶ 44} WFC and Wenrick claim that there was no evidence that they were "instrumental in producing the conditions which caused the [Plaintiffs'] loss" and

that Dice and Collins could not prove by clear and convincing evidence that they could trace their funds.

{¶ 45} In *Cowling,* 109 Ohio St.3d 276, 2006-Ohio-2418, 847 N.E.2d 405, ¶ 18–26, the Supreme Court recently set forth in detail the requirements for the imposition of a constructive trust, including the necessity of tracing. The court stated:

{¶ 46} "A constructive trust is a ' "trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice." ' (Footnotes omitted.) *Ferguson v. Owens* (1984), 9 Ohio St.3d 223, 225, 9 OBR 565, 459 N.E.2d 1293, quoting 76 American Jurisprudence 2d (1975) 446, Trusts, Section 221. A constructive trust is considered a trust because ' "[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." ' Id. at 225, 9 OBR 565, 459 N.E.2d 1293, quoting *Beatty v. Guggenheim Exploration Co.* (1919), 225 N.Y. 380, 386, 389, 122 N.E. 378.

{¶ 47} "A constructive trust is an equitable remedy that protects against unjust enrichment and is usually invoked when property has been obtained by fraud. * * * '[A] constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud.' *Ferguson,* 9 Ohio St.3d at 226, 9 OBR 565, 459 N.E.2d 1293, citing 53 Ohio Jurisprudence 2d (1962) 578–579, Trusts, Section 88; V Scott on Trusts (3d Ed.1967) 3412, Section 462. 'In applying the theories of constructive trusts, courts also apply the well known equitable maxim, "equity regards [as] done that which ought to be done." ' *Ferguson,* 9 Ohio St.3d at 226, 9 OBR 565, 459 N.E.2d 1293.

{¶ 48} "The party seeking to have a constructive trust imposed bears the burden of proof by clear and convincing evidence. * * *

{¶ 49} "Although this court has never addressed the issue of tracing, various Ohio courts have held that a constructive trust cannot be imposed absent tracing by the claimant. * * * The parties agree that tracing is a necessary predicate to the imposition of a constructive trust in Ohio. * * *

{¶ 50} "When they have addressed tracing, courts in Ohio have required the claimant to offer sufficient proof of tracing the property through any changes in form or possessor to the possessor of the property over whom the constructive

trust should be placed. \* \* \* We are in accord with these decisions and hold that before a constructive trust can be imposed, there must be adequate tracing from the time of the wrongful deprivation of the relevant assets to the specific property over which the constructive trust should be placed.

{¶ 51} "We have previously held that a party seeking the judicial imposition of a constructive trust 'bears the burden of producing clear and convincing evidence justifying it.' [*Univ. Hosps. Of Cleveland, Inc. v. Lynch,* 96 Ohio St.3d 118, 2002-Ohio-3748, 772 N.E.2d 105, paragraph three of the syllabus.] *Lynch* specifically referred to the claimant's burden of proof and the evidentiary standard for proving the unjust-enrichment aspect of a constructive trust. \* \* \* We conclude that the same evidentiary burden should apply to tracing and that the burden of proof is on the claimant.

{¶ 52} "A claimant seeking the imposition of a constructive trust must specify the particular property over which the constructive trust is to be placed. If the form or possessor of the property over which the constructive trust should be placed changes during a lawsuit, the claimant should be given an opportunity to conduct discovery, if necessary, and present evidence of the new location or form of the property over which the trust should be placed.

{¶ 53} "A constructive trust is an equitable remedy that must be imposed on particular assets, not on a value. For example, if a party is inequitably deprived of 100 shares of stock that are valued at $10,000, a constructive trust should be imposed over 100 shares of stock, not $10,000. The value of the stock may decrease to $9,000 through no fault of the present possessor. In that instance, it would be inequitable to impose a constructive trust for a higher dollar amount than the stock's new value. Similarly, should the stock rise, the beneficiary of a constructive trust should not be deprived of that increase in value.

{¶ 54} "Constructive trusts should be placed over the property of the party who wrongfully obtained the property. When, as in this case, the property was subsequently transferred to third parties, a constructive trust can be imposed."

{¶ 55} Upon review of the record, we agree with WFC and Wenrick that there is no evidence that they were "instrumental in producing the condition which caused the loss." Although WFC and Wenrick were involved in high-interest and high-risk bridge loans with Invesco, no harm would have befallen Dice and Collins had Chari's $5 million check been genuine. As stated above, although Dice and Collins suggest that WFC and Wenrick were suspicious about whether their October 1999 repayment checks would be honored, there is no evidence that WFC and Wenrick acted wrongfully when they received payment for the antecedent debt.

{¶ 56} Nevertheless, the absence of wrongdoing is not fatal to Dice's and Collins's unjust-enrichment and constructive-trust claim. While constructive trusts are often imposed when the property is obtained by fraud, the Supreme Court has clearly recognized that fraud or wrongdoing is not required. Rather, as stated above, the possessor of the property need only "obtain[ ] or hold[ ] the legal right to property which he ought not, in equity and good conscience, hold and enjoy." *Cowling* at ¶ 18. Although there was no evidence of wrongdoing by WFC and Wenrick, we agree with the trial court that the evidence established that WFC and Wenrick obtained monies that clearly were not meant for them. WFC and Wenrick were to be repaid from the $5 million that Chari deposited with Dayton Title; that money never materialized. Having trusted Chari and Karaman, WFC and Wenrick should suffer the loss to the extent that Dice and Collins were not reimbursed.

{¶ 57} WFC and Wenrick assert that Dice and Collins cannot directly trace their funds to them. They state:

{¶ 58} "Multiple millions of dollars flowed through DTA's IOTA Account each month, and 'when the dust settled' there were funds in DTA's IOTA Account that exceed the principal amounts that Appellees claim they were owed. Appellees completely failed [to] offer any evidence to show that it was in fact Appellants who received their funds as opposed to any other distributee of DTA's IOTA Account, including NCB who took the entire balance in the IOTA Account following the closure of the account. Appellees failed to offer an accounting for DTA's IOTA Account to establish that Appellants actually received their funds. There was no determination that Appellants received Appellee's funds, if Appellees' funds remained in DTA's IOTA Account when NCB swept the account after 'the dust settled', or if their funds were included in the millions of dollar paid from DTA's IOTA account in [the] time period between when Appellants received payment and 'when the dust settled.' Appellees have failed to meet their burden to prove their conversion claim by 'clear and convincing evidence' and as a result, the Court should not overturn the Trial Court's granting Appellants summary judgment."

{¶ 59} We acknowledge that the evidence presented by Dice and Collins does not lend itself to the transaction-by-transaction tracing that is typically necessary to establish the flow of money. Dice and Collins have merely presented evidence that their money was deposited into the Dayton Title escrow account, that they were unable to obtain their money in November 1999, and that the Dayton Title account had been depleted and left with a deficit of more than $4 million as a result of Chari's dishonored checks. WFC and Wenrick, on the other hand, have presented the October 1999 and November 1999 bank statements for the National City Bank account, as well as the November 1999 bank statement for Dayton

Title's National City Bank account. The bank statements reflect numerous debits and credits, none of which can be readily attributed to a particular entity or individual.

{¶ 60} Despite the lack of fiscal accounting that WFC and Wenrick assert is necessary, we find no genuine issue of material fact that WFC and Wenrick received money that rightfully belonged to Dice and Collins. Dice's and Collins's undisputed evidence establishes that the proceeds from their real-estate transactions were placed in Dayton Title's escrow account. Consequently, Dayton Title held these funds in trust for Dice and Collins, and these individuals had an ownership interest in those funds. The parties agree that Chari's deposit of $5 million into the escrow account was dishonored, and thus, the anticipated source of WFC's and Wenrick's repayment checks did not materialize. Consequently, the source of the repayment checks clearly was not Chari but, rather, was, in part, the other individuals and entities who had deposited funds with Dayton Title. Considering that Dice and Collins had not withdrawn their funds from the Dayton Title account at the time "the dust settled" and all account activity ceased, there is little doubt that their money was ultimately used to satisfy the Dayton Title's checks to WFC and Wenrick after Chari's checks were dishonored. See *Union Savings,* supra. Accordingly, we find no fault with the trial court's conclusion that Dice and Collins satisfied the requirements of an unjust-enrichment claim.

{¶ 61} The critical question, therefore, is whether Dice and Collins may pursue an unjust-enrichment claim in light of the UCC. In our judgment, they may not. As stated, the UCC provides that a holder in due course takes a check free from most claims and defenses. To permit a claim for unjust enrichment when the UCC precludes liability is contrary to the "delicately balanced statutory scheme" of the UCC. *Olympic Title,* supra. Accordingly, we must conclude that the trial court erred in granting summary judgment to Dice and Collins on their unjust-enrichment and constructive-trust claim and in failing to grant summary judgment to WFC and Wenrick on that claim.

## C. *Prejudgment Interest and Setoff*

{¶ 62} In light of our disposition of the assignments of error concerning Dice's and Collins's common law claims, the trial court erred in awarding prejudgment interest to Dice and Collins. The issue of the setoff is rendered moot.

{¶ 63} The trial court's grant of summary judgment in favor of Dice and Collins on their unjust-enrichment and constructive-trust claim is reversed. The trial court's grant of summary judgment to WFC and Wenrick on Dice's and

Collins's conversion claim is affirmed. The trial court's award of prejudgment interest is reversed.

Judgment affirmed in part
and reversed in part.

BROGAN and FAIN, JJ., concur.