[Cite as *Hillier v. Fifth Third Bank*, 2020-Ohio-3679.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MIAMI COUNTY

| | | |
|---|---|---|
| JAMES L. HILLIER, INDIVIDUALLY AND AS EXECUTOR OF LESLIE R. HILLIER'S ESTATE | : | |
| | : | |
| | : | Appellate Case No. 2019-CA-21 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 87766-B |
| v. | : | |
| | : | (Appeal from Common Pleas Court-Probate Division) |
| FIFTH THIRD BANK, et al. | : | |
| | : | |
| Defendants-Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of July, 2020.

. . . . . . . . . . .

T. ANDREW VOLLMAR, Atty. Reg. No. 0064033, 40 North Main Street, Suite 2010, Dayton, Ohio 45423
        Attorney for Plaintiff-Appellant

TODD E. BRYANT, Atty. Reg. No. 0072738, 122 West Main Street, Troy, Ohio 45373
        Attorney for Defendant-Appellee, Judy Brown

NATHAN H. BLASKE, Atty. Reg. No. 0076460 and HARRY W. CAPPEL, Atty. Reg. No. 0066513, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202
        Attorneys for Defendant-Appellee, Fifth Third Bank

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-Appellant, James L. Hillier, appeals individually and as executor of the Estate of Leslie R. Hillier, from summary judgments granted to Defendants-Appellees, Fifth Third Bank and Judith Brown.[1]   James is Leslie's grandson, and Judith is Leslie's daughter.   When Leslie died, he had $203,758.09 in two accounts at Fifth Third.   The claims against Fifth Third and Judith arose from the bank's payment to Judith of the total balance in Leslie's accounts.

{¶ 2} According to James, the trial court erred in granting summary judgment for Fifth Third because the bank could not create a contract for a payable on death account by any means other than a written contract signed by the account owner, and Leslie had not entered such a contract.   James also argues that Fifth Third exercised bad faith by paying out the funds when it knew the accounts' ownership was disputed.

{¶ 3} As to Judith, James contends that the trial court incorrectly granted summary judgment in her favor on his unjust enrichment claim, because Judith did not to move for summary judgment.   Additionally, on the merits, James maintains that Judith should not have received summary judgment on unjust enrichment because she received funds that the bank improperly administered.

{¶ 4} After reviewing the record, we conclude that the trial court erred in rendering summary judgment in favor of Fifth Third on the contract and conversion claims.   Under the unambiguous terms of the contract between Leslie and the bank, Leslie's accounts were not payable on death accounts and should have been paid instead to Leslie's estate for distribution under his will.   The trial court also erred in awarding summary judgment

---

[1] For purposes of clarity, we will refer to Fifth Third Bank as "Fifth Third," to the other parties by their first names, and to Leslie Hilliard as "Leslie."

to Judith, as she was not entitled to the amounts in Leslie's accounts and was unjustly enriched by the payments. The court did not err in awarding summary judgment to Fifth Third on James's bad faith, negligence, and estoppel claims, nor did the court err in granting summary judgment to Judith on James's conversion claim. Accordingly, the judgment of the trial court will be affirmed in part and reversed in part, and the matter will be remanded for further proceedings consistent with this opinion.

## I. Facts and Course of Proceedings

{¶ 5} Because we are reviewing this matter after a grant of summary judgment, we review the facts in a light most favorable to the non-movant (James). This case involves the disposition of proceeds in two alleged payable on death ("POD") accounts at Fifth Third, which were owned by Leslie Hillier. Leslie was 98 years old when he died on August 20, 2015.

{¶ 6} In June 1976, Leslie opened savings account XXXXXXX518 ("518") with the bank. The record is not clear with respect to whether the account originated with Fifth Third or was purchased from another bank. Nonetheless, Fifth Third was not able to produce any copies of signature cards that were ever signed for this account, other than an August 2015 card that James signed as power of attorney ("POA").

{¶ 7} In March 1983, Leslie opened checking account XXXXXXX636 ("636"). Fifth Third produced four signature cards for this account. Two of the cards, which were signed in 2012, stated that Leslie and his wife, Glenna, had "joint – with survivor" ownership. On these signature cards, Judith Brown and James L. Hillier (the father of James, the plaintiff-appellant in this case) were listed as POD beneficiaries. Deposition

of Jennifer Nicely (Fifth Third's retail operations manager), Ex.5. Judith was Leslie's daughter, and James L. was his son.

**{¶ 8}** James L. died in November 2014. Shortly after James L. died, James, who lived in North Carolina, received a call from Leslie; Leslie asked if James would be his power of attorney. Leslie also said he was changing his will and asked if James would be the executor. Deposition of James Hillier, p. 38-39. According to James, Leslie was concerned that Judith would come in and take all his money, and he would be a beggar. In addition, neither Glenna nor Leslie wanted to deal with Judith. *Id.* at p. 39-41. James could not recall whether there were one or more powers of attorney, but the only time he used a POA at Fifth Third was on August 13, 2015, when he went to the bank to obtain electronic access to Leslie's bank account. At that time, James was concerned because Leslie had been withdrawing sums of cash from the bank that appeared to be disappearing. *Id.* at p. 38-39, 42, and 45-46.

**{¶ 9}** Glenna died on April 8, 2015. *Id.* at p. 43. On April 17, 2015, James and Leslie went to the Fifth Third Bank in Piqua, Ohio, to remove Glenna's name from Leslie's accounts. After indicating what they wanted, they were asked to wait. A few minutes later, Lesley Swarts, a Fifth Third personal banker, took them into a small office.[2] This was the first time James had been to the bank. *Id.* at p. 62-66. When Swarts asked why they were there, James said his grandmother had passed away, and he (Leslie) wanted to take her off the account. *Id.* at p. 67-68. After that, Leslie did most of the talking. *Id.*

---

[2] Swarts denied ever meeting James prior to her deposition, which was taken on September 2, 2016. Deposition of Lesley Swarts, p. 23. Other factual issues existed as well. However, for reasons that will become apparent, none of the factual issues are genuine issues precluding summary judgment. We provide the factual information as background.

at p. 68.

{¶ 10} Leslie told Swarts that life was not fair, that his son had died in November, that his wife had died, and that his daughter did not talk to him. *Id.* During the conversation, Leslie indicated that James was his grandson and said his grandchildren were helping him. *Id.* at p. 69 and 78. Leslie also said that he wanted his estate to go to his grandchildren. *Id.* at p. 77-78. In addition, Leslie stated during the visit that his directions to the bank were for a distribution of the account funds to his grandchildren. *Id.* at p. 82.

{¶ 11} According to James, Leslie signed several documents that day. James did not read them, but pointed to where Leslie needed to sign. *Id.* at p. 71. One signature card was signed that day – for the 636 checking account. On this card, Leslie was listed as the sole owner, and no POD beneficiaries were listed. Nicely Deposition at p. 71-72, and Ex. 9.

{¶ 12} James and Leslie were at the bank for 30 to 45 minutes, and then immediately went to the office of Leslie's attorney, Thomas Buecker. Hillier Deposition at p. 63-64. Buecker had been Leslie's attorney for years, but James had never met or talked with him before that day. *Id.* at p. 42-43. James and Leslie were at Buecker's office for about 30 to 45 minutes, but it was less time than they had spent at the bank. *Id.* at p. 64. At that time, Leslie signed a POA appointing James as his power of attorney and a new will that granted all his personal and real property to his grandchildren. One half of the estate was to be given James L.'s children, per stirpes, and the other half was to be distributed to Judith's children, per stirpes. In the will, Leslie also stated that "I make no provision for my daughter, Judith Brown." *Id.* at p. 72-73, 83, 100, and 141-144

and Ex. B; April 13, 2015 Will of Leslie Hillier, filed with the probate court on August 25, 2015.

{¶ 13} As noted, the next time James went to Fifth Third was on August 13, 2015, when he met with an employee, Kathy McGill, and filed the POA so he could electronically access the accounts. Hillier Deposition at p. 83-84. On that day, James signed two signature cards using the POA. One card was for checking account 636 and the other was for savings account 518. These cards both listed Judith Brown and James L. Hillier as POD beneficiaries. *Id.* at p. 97 and 106 and Ex. E; Nicely Deposition at p. 129 and Exs. 13 and A; Deposition of Kathy McGill, p. 28-29 and Exs. 1-D and 1-F.

{¶ 14} Leslie died on August 20, 2015. Within a week or two after Leslie's death, James and the estate attorney went to Fifth Third. At that time, they found out that the accounts were supposedly designated POD. Hillier Deposition at p. 32, 37, 100, and 149. Fifth Third then paid the total amounts of the checking and savings accounts ($203,758.09) to Judith, because the only other listed person (James L. Hillier) had already died.

{¶ 15} In June 2017, James filed an action, individually and on behalf of Leslie's estate, against Fifth Third and Judith. The complaint asserted claims against Fifth Third for breach of contract, negligence, conversion, bad faith, and estoppel, while the claims against Judith were based on conversion and unjust enrichment. In July 2017, Judith filed an answer and a counterclaim based on frivolous conduct and "punitive or exemplary damages."

{¶ 16} In May 2018, James filed a motion for summary judgment on all of his claims and on Judith's counterclaims. Fifth Third then filed a cross-motion for summary

judgment. After holding an oral hearing in October 2018, the trial judge issued a decision in January 2019, overruling the motion and cross-motion with respect to the breach of contract claims, negligence claims, and conversion. The judge granted summary judgment to Judith on the issue of unjust enrichment, even though she had not filed a motion for summary judgment, and also granted summary judgment to Fifth Third on the bad faith and estoppel claims. In addition, the judge granted summary judgment in favor of James on Judith's claim for frivolous conduct. The judge did not resolve the claim for punitive damages.

{¶ 17} Following an unsuccessful attempt at mediation, a new judge decided to reconsider the prior summary judgment ruling and gave the parties a chance to file optional supplemental memoranda. Only Fifth Third took that opportunity. On November 22, 2019, the new judge filed an amended entry on the motions for summary judgment. This time, the judge overruled James's motion for summary judgment as to all the claims against Fifth Third and granted Fifth Third's cross-motion as to all claims against it. The judge also granted summary judgment in favor of Judith on James's claims, even though she had not filed a summary judgment motion. And finally, the judge granted James's motion for summary judgment on both of Judith's counterclaims.

{¶ 18} James then filed a notice of appeal from the trial court's judgment. Judith did not appeal the dismissal of her counterclaims.


II. Did the Trial Court Properly Grant Summary Judgment on James's Claims?

{¶ 19} On appeal, James presents one assignment of error (the propriety of the summary judgment decision), with the following two subparts:

A.   The Trial Court Erred in Awarding Summary Judgment to Fifth Third.

B.   The Trial Court Erred in Awarding Summary Judgment to Judith Brown.

**{¶ 20}** We will consider these subparts together, as they are interrelated.   In rendering summary judgment against James, the trial court concluded that Leslie did not specifically inform Fifth Third that he wanted POD designations for the grandchildren on the accounts.   The court further held that if any mistake were made, it was by James and Leslie in believing that the bank understood what Leslie wanted.   Without discussing applicable legal principles, the trial court also concluded that the signature cards James signed on August 13, 2015, clearly designated Judith and James's father (who was then deceased) as POD beneficiaries, and that, again, James was at fault because he failed to read the cards. The court therefore concluded that Fifth Third did not breach its contract with Leslie because the last cards that were signed designated POD beneficiaries.

**{¶ 21}** Due to the existence of a contract, the court also rejected the negligence claim.   Furthermore, based on the conclusion that payment to Judith was proper, the court rejected James's unjust enrichment and conversion claims against her.   In addition, the court found that James failed to argue estoppel and entered judgment for Fifth Third on that claim as well.   Finally, the court held that there was no claim for bad faith, essentially because such a claim is of recent origin and because lack of good faith, as relevant to some issues, is not the same as a cause of action for bad faith.   We will consider the court's holdings, beginning with the contract claim.

A.   The Contract Claim

**{¶ 22}** In arguing that the trial court erred, James contends that statutory requirements for POD accounts require a written contact with the "account owner," which was not satisfied here because James was not the account owner.   James notes that no proper signature card existed for the savings account, and that the April 17, 2015 signature card, which contained no POD designations, was the proper card.   In contrast, Fifth Third argues that the August 13, 2015 signature cards were controlling because they superseded all prior signature cards.   Both sides have also spent considerable time discussing Fifth Third's "Signature Card Procedures" (internal bank policies), whether those procedures were properly followed, and Fifth Third's internal distinction between "add" or replacement cards.

**{¶ 23}** In reviewing summary judgment decisions, we conduct de novo review, "which means that we apply the same standards as the trial court."   *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made."   *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

**{¶ 24}** James filed a claim against Fifth Third for breach of contract.   "The elements of a breach of contract claim are 'the existence of a contract, performance by

the plaintiff, breach by the defendant, and damage or loss to the plaintiff.' " *Becker v. Direct Energy, LP*, 2018-Ohio-4134, 112 N.E.3d 978, ¶ 38 (2d Dist.), quoting *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994). "When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

{¶ 25} "Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989). "Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Id.* Thus, if we conclude that the contracts here are unambiguous, factual disputes as to what was said or not said to Fifth Third employees or Fifth Third's compliance or lack thereof with its internal procedures would be irrelevant.

{¶ 26} Under R.C. 1109.07(B), banks are permitted to "enter into a written contract with a natural person for the proceeds of the person's deposits to be payable on the death of that person to another person or to any entity or organization in accordance with the terms, restrictions, and limitations set forth in sections 2131.10 and 2131.11 of the Revised Code." According to R.C. 2131.10:

A natural person, adult or minor, referred to in sections 2131.10 and 2131.11 of the Revised Code as the owner, may enter into a written contract with any bank * * * whereby the proceeds of the owner's investment share certificate, share account, deposit, or stock deposit may be made payable

on the death of the owner to another person or to any entity or organization, referred to in such sections as the beneficiary, notwithstanding any provisions to the contrary in Chapter 2107. of the Revised Code.  In creating such accounts, "payable on death" or "payable on the death of" may be abbreviated to "P.O.D."

* * *

No change in the designation of the beneficiary shall be valid unless executed in the form and manner prescribed by the bank, building and loan or savings and loan association, credit union, or society for savings.

{¶ 27} "The General Assembly enacted R.C. 2131.10 and 2131.11 in 1961 with the apparent intention of recognizing in Ohio the use of a deposit in a financial institution as a 'tentative trust,' whereby the depositor (settlor) can withdraw funds from the deposit during his lifetime, and at the same time allow the beneficiary of the deposit to have the remainder of the funds at the depositor's death, without regard to the depositor's will or the statute of descent and distribution.   The tentative trust doctrine was recognized in the state of New York in the leading case of *In re Totten* (1904), 179 N.Y. 112, 71 N.E. 748, and resulted in widespread use of what many have called a 'Totten trust' or 'poor man's trust.' "   *Powell v. City Nat. Bank & Tr. Co.*, 2 Ohio App.3d 1, 2, 440 N.E.2d 560 (10th Dist.1981).

{¶ 28} "Although a P.O.D. account is contractual in nature, it has a special purpose.  It allows a person to make a testamentary disposition of assets without following the formalities of the Statute of Wills, R.C. Chapter 2107.  Although it is an exception to the Statute of Wills, one of the basic requirements of the Statute of Wills

cannot be ignored; that is, the requirement of a writing signed by the testator evidencing his intent. Since a P.O.D. account is testamentary in nature, it follows that the term 'written contract' means a writing signed by the owner of the funds showing the intent to dispose of property in contravention of his or her will or the statutes of descent and distribution." *Witt v. Ward*, 60 Ohio App.3d 21, 26, 573 N.E.2d 201 (12th Dist.1989). The statutory language in R.C. 2131.10 gives "the depositor full ownership of a P.O.D. account's funds during her lifetime, whereas the beneficiary's interest does not vest until the owner's death." *Miller v. Peoples Fed. Sav. & Loan Assn.*, 68 Ohio St.2d 175, 178, 429 N.E.2d 439 (1981).

{¶ 29} In the case before us, the last signature card the account owner, Leslie, signed was the April 17, 2015 card without any POD beneficiaries. The parties have quibbled over the meaning of the first sentence in R.C. 2131.10 – "A natural person, adult or minor, referred to in sections 2131.10 and 2131.11 of the Revised Code as the owner * * *." James contends that this means that only the account owner (Leslie) may enter into the contract, while the bank asserts that the statutory language means that any natural person may enter into the contract, and that, therefore, the cards signed by James on August 13, 2015, were valid. Our view of the statute is that the term "owner" and natural person are one and the same. In other words, "owner" is simply another means of referring in the statute to the person entitled to enter into a POD.

{¶ 30} We find that the distinctions both sides suggest are essentially irrelevant, because the real issues center on the terms of the contract and whether James's POA permitted him to change the beneficiaries.

{¶ 31} "A power of attorney is a written instrument authorizing an agent to perform

specific acts on behalf of his principal." *Testa v. Roberts*, 44 Ohio App.3d 161, 164, 542 N.E.2d 654 (6th Dist.1988). In Ohio, powers of attorney are controlled by statute. *See* R.C. Chap. 1337. As relevant here, R.C. 1337.49 provides that:

Unless the power of attorney otherwise provides, language in a power of attorney granting general authority with respect to banks and other financial institutions authorizes the agent to do all of the following:

(A) Continue, modify, and terminate an account or other banking arrangement made by or on behalf of the principal;

(B) Establish, modify, and terminate an account or other banking arrangement with a bank, trust company, savings and loan association, credit union, thrift company, brokerage firm, or other financial institution selected by the agent * * *.

{¶ 32} This authority, however, is qualified by R.C. 1337.42. which states, in pertinent part, that:

(A) An agent under a power of attorney may do any of the following on behalf of the principal or with the principal's property *only* if the power of attorney *expressly grants* the agent the authority and if exercise of the authority is not otherwise prohibited by another agreement or instrument to which the authority or property is subject * * * :

(3) Create or change rights of survivorship;

(4) Create or change a beneficiary designation;

* * *

(C) Subject to divisions (A), (B), (D), and (E) of this section, if a power

of attorney grants to an agent authority to do all acts that a principal could do, the agent has the general authority described in sections 1337.45 to 1337.57 of the Revised Code.

(Emphasis added.)

{¶ 33} In *Dorsey v. Dorsey*, 11th Dist. Trumbull No. 2010-T-0043, 2011-Ohio-6336, a son of the decedent held a POA and used it during the decedent's lifetime to change the joint and survivorship designations on some accounts. He also closed one joint and survivorship account on which the decedent and his brother were co-owners, and opened up a new account, listing the decedent and a sister as co-owners. After reviewing the issues, the court of appeals held that the changes were invalid, because "there is no provision in that instrument giving [the son] authority to remove co-owners from [the decedent's] joint and survivorship accounts or to designate others as co-owners on those accounts." *Id.* at ¶ 50. The court, therefore, agreed with the trial court that those amounts would have to be returned to the decedent's estate. *Id.*

{¶ 34} Reviewing the power of attorney involved in this case, it likewise did not expressly give James the right to designate beneficiaries. Specifically, the POA provided, in relevant part, that:

> Know All Men by These Presents, that I, Leslie R. Hillier, * * * do appoint James Leslie Hillier as my true and lawful attorney in fact to act in, manage, and conduct all my business affairs, and for that purpose for me in my name, place, and stead, and for my use and benefit, and as my act and deed, to do and execute, to concur with persons jointly interested with myself therein in the doing or executing of, all or any of the following acts or

deeds, and things, to wit:

* * *

3. To make, do and transact all and every kind of business of whatsoever kind or nature, including the receipt, recovery, collection, payment, compromise, settlement and adjustment of all accounts, including checking, savings, and/or commercial accounts * * *;

* * *

Giving and granting unto my said attorney full power and authority to do and perform any and every act, deed, matter, and things whatsoever in and about my estate, property, and affairs, as fully and effectually to all intents and purposes as I might or could do in my own proper person if personally present, the above specifically enumerated powers being in aid and exemplification of the full, complete, and general power herein granted and not in limitation or definition thereof; and hereby ratifying all that my said attorney shall lawfully do or cause to be done by virtue of those presents.

Affidavit of Fifth Third Employee Kathy McGill, Ex. A., p. 1-2

{¶ 35} The above powers, while broad and general, do not provide, as R.C. 1337.42(A)(4) requires, that James had the specific power to change or designate beneficiaries on Leslie's accounts. In this vein, Fifth Third argues that because R.C. 1337.49 lets POAs "modify" accounts, James was entitled to change beneficiaries and the August 2015 signature card, therefore, is binding. Fifth Third Brief, p. 11. However, the statutory limitations on POAs are quite specific, and the wording in the POA Leslie granted is not sufficient to satisfy the requirements in R.C. 1337.42(A). Consequently,

the beneficiary designations on the August 13, 2015 signature card were invalid and had no effect. In view of these facts, whether James read or was aware of the designations was irrelevant.

{¶ 36} Furthermore, Fifth Third's assertion on appeal contradicts the admissions it made in the trial court. Specifically, in its answer, Fifth Third stated that "Fifth Third admits that Plaintiff, as Decedent's Power of Attorney or otherwise, did not authorize Fifth Third [to] change the payable on death beneficiaries listed on the Accounts." Answer of Fifth Third, ¶ 11.

{¶ 37} In its answers to requests for admissions, Fifth Third further stated that James's "execution of the Checking Account signature card dated August 13, 2015 did not create new payable on death beneficiaries for the Checking Account on August 13, 2015," and that "a power of attorney does not have the ability to change beneficiaries on accounts if the document creating the power of attorney does not permit it." *See* Fifth Third Notice of Filing Answers to Requests for Admissions #3, p. 5, and #4, p. 5. Fifth Third's contention in its answers to the requests for admissions was that the signature card James signed "confirmed" the beneficiaries already in the bank's system. *Id.* However, as the following discussion reveals, James could not confirm what did not exist.

{¶ 38} Accordingly, the signature card James signed in August 2015 had no effect and did not create POD beneficiaries for the account. The last signature card was the one that Leslie signed on April 17, 2015, which stated that Leslie was the sole owner of the checking account and did not designate any POD beneficiaries.

{¶ 39} Fifth Third's argument on appeal (contrary to its above argument) is that the POD beneficiaries were in its "internal" system, and that its employee simply accidentally

omitted them on the April 2015 signature card. In this respect, Fifth Third relies on its internal signature card procedures. However, whether Fifth Third followed these procedures or what its internal procedures may have been is irrelevant. As we indicated, individuals are statutorily allowed to enter into written contracts with banks for payments of their accounts.

{¶ 40} There is no question that a contract existed between Leslie and Fifth Third. "In order to form any contract, there must be a meeting of the minds of the parties regarding the contract's essential terms, and those terms must be reasonably certain and clear." *Bank of New York Mellon v. Rhiel*, 155 Ohio St.3d 558, 2018-Ohio-5087, 122 N.E.3d 1219, ¶ 19. "The primary goal in construing any contract is to ascertain and give effect to the intention of the parties," and courts "presume that the intent of the parties to a written contract is found in the writing of the contract itself." *Id.* at ¶ 20. The law is well-established that "where * * * the parties following negotiations make mutual promises which thereafter are integrated into an unambiguous contract duly executed by them, courts will not give the contract a construction other than that which the plain language of the contract provides." *Aultman Hosp. Assn.*, 46 Ohio St.3d at 55, 544 N.E.2d 920.

{¶ 41} Although, in one sense, there is no real negotiating with a bank when one opens an account, the signature card is the legally binding contract between the customer and Fifth Third. Nicely Deposition, p. 52 and 53. In contrast, the signature card procedures are internal bank documents; customers are not given these procedures, nor do they have access to them. *Id.* at p. 51. As a result, these procedures could have no bearing on the contract, where the contract is not ambiguous.

{¶ 42} The signature card that Leslie signed on April 17, 2015, was for the

checking account (636) only.   As noted, Fifth Third has not been able to produce a signature card for the savings account.   The 636 signature card provided, in pertinent part, under "Terms and Conditions," that:

1.   The terms and conditions stated herein, together with resolutions or authorizations which accompany this signature card, if applicable and the Rules, Regulations, Agreements, and Disclosures of Bank constitute the Deposit Agreement ("Agreement") between the Individual (s) or entity (ies) and the named person herein ("Depositor") and the Bank.

2.   This Agreement incorporates the Rules, Regulations, Agreements, and Disclosures established by Bank from time to time, clearing house rules and regulations, state and federal laws, recognized banking practices and customs, service charges as may be established from time to time and is subject to laws regulating transfers at death and other taxes.

\* \* \*

7.   All signers agree to the Terms and Conditions set forth herein and acknowledge receipt of a copy of the Rules and Regulations, Agreements, and Disclosures of Bank and agree to the terms set forth herein.

Affidavit of Jennifer Nicely, Ex. C, p. 1.

{¶ 43} The Rules and Regulations of the bank that were in effect as of May 2015 were attached to Nicely's affidavit as Ex. H.   Concerning POD accounts, these rules stated that:

17. Payable on Death Accounts. If your account type permits a payable on death beneficiary or custodian designation, this paragraph applies. *When the signature card designates the beneficiary to receive the account funds upon the death of the Customer, it supersedes and revokes any previous appointment of any other Beneficiary.* Customer may withdraw all or any portion of the account balance during his lifetime and Customer retains the right to revoke the designation of any Beneficiary. Bank has the right to deal with Customer as if a Beneficiary was not named. The amount on deposit in this account at the death of the Customer shall belong and be paid to the Beneficiary, if the Beneficiary survives the Customer, subject to the provisions of this Agreement, the rules of Bank and applicable laws. Payment to the Beneficiary after the death of the Customer shall be a valid and full release and complete discharge of the Bank from any and all liability and shall be binding on the heirs, executors, administrators and assigns of Customer. Bank reserves the right to require satisfactory proof of death of the Customer and survival of Beneficiary.

Ex. H, p. 15.

**{¶ 44}** According to the clear and unambiguous meaning of this provision, the signature card that Leslie signed on April 17, 2015, superseded and revoked any prior beneficiary with respect to the checking account. There was also no ambiguity in the signature card. It stated that Leslie was the sole owner of the account and no POD beneficiaries were listed. Consequently, there was no need to consider extrinsic evidence of any kind. (In this regard, we note that the facts set forth in the statement of

facts and proceedings were intended as background information only.)

{¶ 45} Based on the preceding discussion, and under the undisputed facts and applicable law, the trial court erred in granting summary judgment to Fifth Third on the breach of contract claim. To the contrary, summary judgment should have been granted to James, as executor, and the funds in checking account 636 ($82,647.72) should have been paid to Leslie's estate. Whether the bank is liable for this amount will be discussed shortly.

{¶ 46} The facts concerning the savings account (518) are somewhat different. As noted, Fifth Third did not have a signature card for the 518 account. There were indications in Fifth Third's internal records that POD beneficiaries may have been designated at one time for that account. However, Fifth Third's argument likewise fails for this account because there was not sufficient evidence of a *written agreement* for the account. To establish the existence of POD beneficiaries as an exception to the Statute of Wills, both R.C. 1109.07(B) and R.C. 2131.10 require a *written contract* signed by the account owner. Fifth Third could not produce a written signature card, and its internal records were insufficient to substitute for the statutory requirements. As a result, the $121,145.13 in the savings account should have been paid to Leslie's estate, rather than to Judith, and the trial court erred in granting summary judgment to Fifth Third on this point as well. Judgment should have been awarded to James, as executor for the estate.

{¶ 47} Even if judgment should have been awarded to the executor, an issue remains whether the bank is liable. According to Fifth Third, James, as executor, had a mechanism under R.C. 1109.10 by which he could have asserted his claim to the funds, but he failed to use it. Fifth Third contends that because James did not have a proper

right to the funds and failed to assert his claim using the statutory procedure, Fifth Third was obligated to release the funds to Judith and is not liable.

{¶ 48} As a preliminary point, Fifth Third's contention is incorrect to the extent that it is based on the fact that James, as executor, did not have a right to the funds. We have already concluded that the estate had such a right, and James, as executor of the estate, was the appropriate party to bring claims on the estate's behalf. *E.g.*, R.C. 2107.46; *Ross v. Barker*, 101 Ohio App.3d 611, 615, 656 N.E.2d 363 (2d Dist.1995).

{¶ 49} As to the remainder of Fifth Third's argument, we note that R.C. 1109.10 was enacted in 1996 via H.B. 538, 1996 Ohio Laws File 187, for purposes of adopting a new section number for former R.C. 1107.11. No substantive changes were made in the content of the statute. At the time of the events at issue in this case, R.C. 1109.10 provided that:

> If any claim not clearly consistent with the terms of any applicable authority on file with a bank is made to any deposit, safe deposit box, property held in safekeeping, security, obligation, or other property in the bank's possession or control, in whole or in part, by any person, including any depositor, individual, or group of individuals, whether or not authorized to draw on or exercise any right or control with respect to the property, the bank is not required to recognize the claim without one of the following:

> (A) A court order, issued by a court of competent jurisdiction and served on the bank, enjoining or restraining the bank from taking any action with respect to the property or instructing the bank to pay the balance of the, [sic] provide access to the safe deposit box, or deliver the property as

provided in the order;

(B) A bond in the form and amount and with sureties satisfactory to the bank, indemnifying the bank against any liabilities, loss, and expenses it might incur because of its recognition of the claim or because of its refusal, due to the claim, to honor or recognize any right with respect to the property.[3]

{¶ 50} The commentary to the former section, R.C. 1107.11 (which was adopted in 1967), says that "[t]his section is new and states the requirement which one making an adverse claim to a deposit or property held in safe deposit must meet before the bank will be required to deliver such deposit or property."

{¶ 51} The fact that a bank is not necessarily required to deliver the property to an adverse claimant does not mean that the bank lacks responsibility for delivering property to the wrong party. Thus, James's failure, as executor, to use the process in R.C. 1109.10 does not relieve the bank from liability for breach of contract.

{¶ 52} We note that Fifth Third's Rules and Regulations state that, "[i]n the event of a conflict between Account Owners or individuals with signing authority or those purporting to have signing authority on the Account, the Bank reserves the right to take action, which may include, without limitation, placing a hold on the Account or instituting legal proceedings." Nicely Affidavit, Ex. H, at p. 9.

---

[3] R.C. 1109.10 was subsequently amended in 2017 as part of a new banking law that repealed separate statutes pertaining to savings and loan associations (R.C. Chapters 1151 to 1157), savings banks (R.C. Chapters 1161 to 1165), and "regulated banks, savings and loan associations, and savings banks under the same statute" by modifying the law governing banks. Ohio Bill Analysis, 2017 H.B. 49. The contents of this amended version and the version in effect in 2015 do not differ in any appreciable way.

{¶ 53} Fifth Third was notified before it disbursed the funds to Judith that an adverse claim to the funds existed.   Hillier Deposition at p. 100 and 128-129.   However, rather than placing a hold on the account or instituting legal proceedings, Fifth Third chose to release the funds.   Even if this were otherwise, Fifth Third could have taken this action to protect itself from liability for breach of contract.   Accordingly, Fifth Third may be held liable for breach of contract.

{¶ 54} As was noted, the trial court also granted summary judgment to Fifth Third on claims for bad faith, negligence, conversion, and estoppel.   James has not addressed the estoppel issue on appeal, and we will not consider it further.   We will next discuss the bad faith claim.

## B.   Bad Faith Claim

{¶ 55} Concerning "bad faith," the trial court concluded that bad faith claims are of recent origin and a lack of good faith, as relevant to some issues, is not the same as a cause of action for bad faith.   Decision on Summary Judgment, p. 10-11.

{¶ 56} "The duty of good faith and fair dealing being integral to any contract, the breach of that duty, when alleged, is thus integral to the plaintiff's cause of action for breach of contract.   Accordingly, 'an allegation of a breach of the implied covenant of good faith cannot stand alone as a separate cause of action from a breach of contract claim * * *.' "   *Krukrubo v. Fifth Third Bank*, 10th Dist. Franklin No. 07AP-270, 2007-Ohio-7007, ¶ 19, quoting *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. Franklin No. 04AP-980, 2006-Ohio-638, ¶ 98. "In essence, a claim for breach of contract subsumes the accompanying claim for breach of the duty of good faith and fair dealing."   *Id.*

{¶ 57} In view of this authority, we agree that summary judgment was properly granted on James's bad faith claim. We do note that banks may be held liable in some situations for bad faith under R.C. Chap. 1334, which governs "Bank Deposits and Collections; Transfer of Funds." Under R.C. 1304.03(A), the parties may vary the effect of the provisions of R.C. Chap. 1334, but they "cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable."

{¶ 58} R.C. 1304.03(E) further provides that, "[t]he measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there also is bad faith, the measure of damages includes any other damages the party suffered as a proximate consequence." This statute was effective in 1962 and corresponded with Uniform Commercial Code 4-103. It was then amended in 1994, but no substantive changes were made to R.C. 1304.03(E). *See* S.B. 147, 1994 Ohio Laws File 145.

{¶ 59} This is not to say R.C. 1304.03(E) applies here. We raise the matter merely to indicate that a bank may, indeed, be found guilty of acting in bad faith in certain situations, even in light of a contractual relationship or breach of contract claim. For example, in *Natl. City Bank v. Rhoades*, 150 Ohio App.3d 75, 2002-Ohio-6083, 779 N.E.2d 799 (2d Dist.), we agreed that a bank was liable for improperly disbursing funds in its customer's account to the customer's girlfriend. *Id.* at ¶ 37-43. We recognized that a bad faith claim could exist, which would allow recovery of consequential damages

under R.C. 1304.03(E). *Id.* at ¶ 68-69. However, we held that there was no evidence of the bank's bad faith.

**{¶ 60}** Banks may also be held liable for consequential damages like profit or for attorney fees where their acts are willful or malicious. *See Cincinnati Ins. Co. v. First Nat. Bank of Akron*, 63 Ohio St.2d 220, 226, 407 N.E.2d 519 (1980) (rejecting award of profits bank made when it improperly paid checks drawn on customer's account because the bank's acts were not willful; attorney fee award was also improper due to lack of statutory basis or evidence that bank's acts were malicious). *See also City of Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 66, 521 N.E.2d 814 (1988) ("[g]enerally a prevailing party may not recover attorney fees as costs of litigation in the absence of statutory authority unless the breaching party has acted in bad faith, vexatiously, wantonly, obdurately or for oppressive reasons.")

**{¶ 61}** " ' "Bad faith" is a legal term of art, which is not defined in the Ohio Uniform Commercial Code. Logically, it is the inverse of "good faith," which is defined as "honesty in fact in the conduct or transaction concerned." R.C. 1301.01(S). Thus, while not specifically defined, "bad faith" suggests dishonesty, fraud, or misrepresentation, which are intentional in nature and beyond the perimeters of mere negligence.' " *Fifth Third Bank v. Gen. Bag Corp.*, 8th Dist. Cuyahoga No. 92793, 2010-Ohio-2086, ¶ 31, quoting *Johnson v. Third Fed. S. & L. Assn. of Cleveland*, 8th Dist. Cuyahoga No. 49236, 1985 WL 6888 (June 27, 1985).

**{¶ 62}** Assuming for purposes of argument that a bad faith claim could exist, the trial court did not err in granting summary judgment on this claim in this case. There was no evidence that Fifth Third's actions were dishonest, willful, or malicious, and James did

not present evidence of damages beyond what was due to be paid under the contract between the account owner and the bank.   Accordingly, the trial court correctly rendered summary judgment against James on the claim that Fifth Third acted in bad faith.

## C.   The Negligence Claim

{¶ 63} Regarding the negligence claim, the trial court rejected this claim as well, citing *Solid Gold Jewelers v. ADT Sec. Sys., Inc.*, 600 F.Supp.2d 956 (N.D.Ohio 2007). In *Solid Gold Jewelers*, the court explained that " '[u]nder Ohio law, the existence of a contract action generally excludes the opportunity to present the same case as a tort claim.' "   *Id.* at 960, quoting *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir.1981).   Exceptions to this rule exist " 'if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed.' "   *Id.*, quoting *Wolfe*.

{¶ 64} The authority that *Wolfe* relied on was *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922).   *Wolfe* at 710.   The holding in *Ketcham* was essentially that, where the gravamen of a party's complaint is breach of contract, the perpetrator's motive in breaching is irrelevant, and a trial court errs if it admits evidence indicating that the case is one in which exemplary damages might be awarded.   *Ketcham* at 377-378.   As recently as 2018, the Supreme Court of Ohio approved and followed *Ketcham,* holding that "[p]unitive damages are not recoverable in an action for breach of contract."   *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, paragraph one of the syllabus.

{¶ 65} In *Lucarell*, the court acknowledged that Ohio cases have held that both a

contract action and a tort action may exist where breach of an independent duty is involved. *Id.* at ¶ 36. The court cautioned, however, that while "we have noted that the conduct constituting a breach of contract can also constitute a tort, we have made clear that punitive damages are available only when the claimant 'suffered a harm distinct from the breach of contract action and attributable solely to the alleged tortious conduct.' " *Id.* at ¶ 37, quoting *Shimola v. Nationwide Ins. Co.*, 25 Ohio St.3d 84, 86, 495 N.E.2d 391 (1986).

{¶ 66} In the case before us, James failed to present any evidence of an "independent tort," and he has not outlined any harm he or the estate suffered other than that attributable to the breach of contract. Accordingly, the trial court did not err in rendering summary judgment on the negligence claim.

## D. Conversion

{¶ 67} The claim for conversion was brought against both Fifth Third and Judith. In rejecting the claim with regard to both parties, the trial court noted that Fifth Third acted properly in honoring Judith's claim. The court also remarked that Judith could have subjected the bank to a lawsuit had it not complied with the POD designation. Decision on Summary Judgment at p. 9-10. To the extent the court's conclusions rest on the fact that the balance of the accounts was properly owed to Judith, the court erred, for the reasons noted above.

{¶ 68} "Conversion is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Dice v. White Family Cos.*, 173 Ohio App.3d 472, 2007-Ohio-5755, 878 N.E.2d 1105, ¶ 17 (2d

Dist.).   "Typically, '[t]he elements of a conversion cause of action are (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.' "   *Id.*, quoting *Haul Transport of VA, Inc. v. Morgan*, 2d Dist. Montgomery No. 14859, 1995 WL 328995 (June 2, 1995).

{¶ 69} Given the undisputed facts in this case, James established that the checking and savings accounts belonged to Leslie's estate, that Fifth Third wrongfully disposed of the sums in the accounts by paying them to Judith, and that the estate was damaged by Fifth Third's acts.   Consequently, the trial court erred in rendering summary judgment to Fifth Third on this cause of action.   Instead, judgment should have been rendered in favor of James, as executor of the estate.   We do agree that summary judgment on this point was properly granted to Judith, as she was not the party wrongfully disposing of the assets.   The claim against Judith was more properly classified as one for unjust enrichment, as we will explain below.   Accordingly, the assignment of error is sustained with respect to the summary judgment on conversion granted to Fifth Third, but overruled as to Judith.

E.   Unjust Enrichment

{¶ 70} The final issue relates t0 the summary judgment granted to Judith (subpart B).   As indicated, the only claims against Judith were for conversion and unjust enrichment.   The trial court granted summary judgment in Judith's favor on the unjust enrichment claim even though she had not moved for summary judgment, and it gave no reasons for doing so.   Decision on Summary Judgment at p. 8-9.   Presumably, the

court's decision was based on its prior conclusion that the money in the accounts was properly paid to Judith as the POD beneficiary.

{¶ 71} "Unjust enrichment occurs when a person has and retains money or benefits that in justice and equity belong to another." *Union Sav. Bank v. White Family Cos., Inc.*, 167 Ohio App.3d 51, 2006-Ohio-2629, 853 N.E.2d 1182, ¶ 26 (2d Dist.), citing *Hummel v. Hummel*, 133 Ohio St. 520, 14 N.E.2d 923 (1938). " 'A person who has been unjustly enriched at the expense of another is required to make restitution to the other.' " *Dixon v. Smith*, 119 Ohio App.3d 308, 317, 695 N.E.2d 284 (3d Dist.1997), quoting Restatement of the Law 1st, Restitution, Section 1 at 12 (1937).

{¶ 72} For the reasons previously discussed, the trial court erred in entering summary judgment in Judith's favor on this claim. Based on the undisputed facts and applicable law, the proceeds of Leslie's savings and checking accounts were improperly paid to Judith and should have been paid to Leslie's estate. Judith, therefore, retains money that belongs to another. Consequently, James's assignment of error is sustained as to the grant of summary judgment in Judith's favor on the unjust enrichment claim.

III.   Conclusion

{¶ 73} James's sole assignment of error having been sustained in part and overruled in part, the judgment of the trial court is reversed as to the summary judgment rendered in favor of Fifth Third on the breach of contract and conversion claims. The summary judgment in favor of Fifth Third on the claims for bad faith, negligence, and estoppel are affirmed. In addition, the summary judgment in Judith's favor is affirmed as to the conversion claim and reversed as to the claim for unjust enrichment. This cause

is remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies sent to:

T. Andrew Vollmar
Todd E. Bryant
Nathan H. Blaske
Harry W. Cappel
Hon. Scott Altenburger